UNITED STATES DEPARTMENT OF TREASURY
ET AL. *v.* FABE, SUPERINTENDENT OF
INSURANCE OF OHIO

No. 91–1513.  Argued December 8, 1992—Decided June 11, 1993

*Robert A. Long, Jr.,* argued the cause for petitioners. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Mahoney,* and *William Kanter.*

*James R. Rishel* argued the cause for respondent. With him on the brief were *David A. Kopech* and *Zachary T. Donovan.*\*

---

\*Briefs of *amici curiae* urging affirmance were filed for the Bureau of Insurance, Commonwealth of Virginia, et al. by *Harold B. Gold* and *Randolph N. Wisener;* for the Council of State Governments et al. by *Richard Ruda* and *Michael J. Wahoske;* for the National Association of Insurance

JUSTICE BLACKMUN delivered the opinion of the Court.

The federal priority statute, 31 U. S. C. § 3713, accords first priority to the United States with respect to a bankrupt debtor's obligations. An Ohio statute confers only fifth priority upon claims of the United States in proceedings to liquidate an insolvent insurance company. Ohio Rev. Code Ann. § 3903.42 (1989). The federal priority statute preempts the inconsistent Ohio law unless the latter is exempt from pre-emption under the McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. § 1011 *et seq.* In order to resolve this case, we must decide whether a state statute establishing the priority of creditors' claims in a proceeding to liquidate an insolvent insurance company is a law enacted "for the purpose of regulating the business of insurance," within the meaning of § 2(b) of the McCarran-Ferguson Act, 15 U. S. C. § 1012(b).

We hold that the Ohio priority statute escapes preemption to the extent that it protects policyholders. Accordingly, Ohio may effectively afford priority, over claims of the United States, to the insurance claims of policyholders and to the costs and expenses of administering the liquidation.

Commissioners by *Susan E. Martin;* for the National Conference of Insurance Guaranty Funds et al. by *F. James Foley;* for the National Conference of Insurance Legislators by *Stephen W. Schwab;* for Salvatore R. Curiale by *Mathias E. Mone* and *Adam Liptak;* for James A. Gordon by *Paul W. Grimm;* for Lewis Melahn by *W. Dennis Cross;* and for Stephen F. Selcke by *Peter G. Gallanis.*

A brief of *amici curiae* was filed for the State of Michigan et al. by *Frank J. Kelley,* Attorney General of Michigan, *Thomas L. Casey,* Solicitor General, and *Harry G. Iwasko, Jr.,* and *Janet A. VanCleve,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Robert A. Butterworth* of Florida, *Robert T. Stephan* of Kansas, *J. Joseph Curran, Jr.,* of Maryland, *Marc Racicot* of Montana, *Robert J. Del Tufo* of New Jersey, *Daniel E. Lungren* of California, *Larry EchoHawk* of Idaho, *Michael E. Carpenter* of Maine, *Hubert H. Humphrey III* of Minnesota, *Frankie Sue Del Papa* of Nevada, and *Tom Udall* of New Mexico.

But when Ohio attempts to rank other categories of claims above those pressed by the United States, it is not free from federal pre-emption under the McCarran-Ferguson Act.

## I

The Ohio priority statute was enacted as part of a complex and specialized administrative structure for the regulation of insurance companies from inception to dissolution. The statute proclaims, as its purpose, "the protection of the interests of insureds, claimants, creditors, and the public generally." § 3903.02(D). Chapter 3903 broadly empowers the State's Superintendent of Insurance to place a financially impaired insurance company under his supervision, or into rehabilitation, or into liquidation. The last is authorized when the superintendent finds that the insurer is insolvent, that placement in supervision or rehabilitation would be futile, and that "further transaction of business would be hazardous, financially or otherwise, to [the insurer's] policyholders, its creditors, or the public." § 3903.17(C). As liquidator, the superintendent is entitled to take title to all assets, § 3903.18(A); to collect and invest moneys due the insurer, § 3903.21(A)(6); to continue to prosecute and commence in the name of the insurer any and all suits and other legal proceedings, § 3903.21(A)(12); to collect reinsurance and unearned premiums due the insurer, §§ 3903.32 and 3903.33; to evaluate all claims against the estate, § 3903.43; and to make payments to claimants to the extent possible, § 3903.44. It seems fair to say that the effect of all this is to empower the liquidator to continue to operate the insurance company in all ways but one—the issuance of new policies.

Pursuant to this statutory framework, the Court of Common Pleas for Franklin County, Ohio, on April 30, 1986, declared American Druggists' Insurance Company insolvent. The court directed that the company be liquidated, and it appointed respondent, Ohio's Superintendent of Insurance, to serve as liquidator. The United States, as obligee

on various immigration, appearance, performance, and payment bonds issued by the company as surety, filed claims in excess of $10.7 million in the state liquidation proceedings. The United States asserted that its claims were entitled to first priority under the federal statute, 31 U. S. C. § 3713(a)(1)(A)(iii), which provides: "A claim of the United States Government shall be paid first when . . . a person indebted to the Government is insolvent and . . . an act of bankruptcy is committed."[1]

Respondent Superintendent brought a declaratory judgment action in the United States District Court for the Southern District of Ohio seeking to establish that the federal priority statute does not pre-empt the Ohio law designating the priority of creditors' claims in insurance-liquidation proceedings. Under the Ohio statute, as noted above, claims of federal, state, and local governments are entitled only to fifth priority, ranking behind (1) administrative expenses, (2) specified wage claims, (3) policyholders' claims, and (4) claims of general creditors. § 3903.42.[2]

---

[1] In its entirety, § 3713 reads:

"(a)(1) A claim of the United States Government shall be paid first when—

"(A) a person indebted to the Government is insolvent and—

"(i) the debtor without enough property to pay all debts makes a voluntary assignment of property;

"(ii) property of the debtor, if absent, is attached; or

"(iii) an act of bankruptcy is committed; or

"(B) the estate of a deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor.

"(2) This subsection does not apply to a case under title 11.

"(b) A representative of a person or an estate (except a trustee acting under title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government."

[2] In its entirety, § 3903.42 reads:

"The priority of distribution of claims from the insurer's estate shall be in accordance with the order in which each class of claims is set forth in

Respondent argued that the Ohio priority scheme, rather than the federal priority statute, governs the priority of claims of the United States because it falls within the anti-

---

this section. Every claim in each class shall be paid in full or adequate funds retained for such payment before the members of the next class receive any payment. No subclasses shall be established within any class. The order of distribution of claims shall be:

"(A) Class 1. The costs and expenses of administration, including but not limited to the following:

"(1) The actual and necessary costs of preserving or recovering the assets of the insurer;

"(2) Compensation for all services rendered in the liquidation;

"(3) Any necessary filing fees;

"(4) The fees and mileage payable to witnesses;

"(5) Reasonable attorney's fees;

"(6) The reasonable expenses of a guaranty association or foreign guaranty association in handling claims.

"(B) Class 2. Debts due to employees for services performed to the extent that they do not exceed one thousand dollars and represent payment for services performed within one year before the filing of the complaint for liquidation. Officers and directors shall not be entitled to the benefit of this priority. Such priority shall be in lieu of any other similar priority that may be authorized by law as to wages or compensation of employees.

"(C) Class 3. All claims under policies for losses incurred, including third party claims, all claims against the insurer for liability for bodily injury or for injury to or destruction of tangible property that are not under policies, and all claims of a guaranty association or foreign guaranty association. All claims under life insurance and annuity policies, whether for death proceeds, annuity proceeds, or investment values, shall be treated as loss claims. That portion of any loss, indemnification for which is provided by other benefits or advantages recovered by the claimant, shall not be included in this class, other than benefits or advantages recovered or recoverable in discharge of familial obligations of support or by way of succession at death or as proceeds of life insurance, or as gratuities. No payment by an employer to an employee shall be treated as a gratuity. Claims under nonassessable policies for unearned premium or other premium refunds.

"(D) Class 4. Claims of general creditors.

"(E) Class 5. Claims of the federal or any state or local government. Claims, including those of any governmental body for a penalty or forfeit-

pre-emption provisions of the McCarran-Ferguson Act, 15 U. S. C. § 1012.[3]

The District Court granted summary judgment for the United States. Relying upon the tripartite standard for divining what constitutes the "business of insurance," as articulated in *Union Labor Life Ins. Co.* v. *Pireno*, 458 U. S. 119 (1982), the court considered three factors:

> "'*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance

---

ure, shall be allowed in this class only to the extent of the pecuniary loss sustained from the act, transaction, or proceeding out of which the penalty or forfeiture arose, with reasonable and actual costs occasioned thereby. The remainder of such claims shall be postponed to the class of claims under division (H) of this section.

"(F) Class 6. Claims filed late or any other claims other than claims under divisions (G) and (H) of this section.

"(G) Class 7. Surplus or contribution notes, or similar obligations, and premium refunds on assessable policies. Payments to members of domestic mutual insurance companies shall be limited in accordance with law.

"(H) Class 8. The claims of shareholders or other owners."

[3] Section 1012 reads:

"(a) State regulation

"The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) Federal regulation

"No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State Law."

industry.'" App. to Pet. for Cert. 36a (quoting *Pireno*, 458 U. S., at 129).

Reasoning that the liquidation of an insolvent insurer possesses none of these attributes, the court concluded that the Ohio priority statute does *not* involve the "business of insurance." App. to Pet. for Cert. 45a.

A divided Court of Appeals reversed. 939 F. 2d 341 (CA6 1991). The court held that the Ohio priority scheme regulates the "business of insurance" because it protects the interests of the insured. *Id.*, at 350–351. Applying *Pireno*, the court determined that the Ohio statute (1) transfers and spreads the risk of insurer insolvency; (2) involves an integral part of the policy relationship because it is designed to maintain the reliability of the insurance contract; and (3) focuses upon the protection of policyholders by diverting the scarce resources of the liquidating entity away from other creditors. 939 F. 2d, at 351–352.[4]

Relying upon the same test to reach a different result, one judge dissented. He reasoned that the liquidation of insolvent insurers is not a part of the "business of insurance" because it (1) has nothing to do with the transfer of risk between insurer and insured that is effected by means of the insurance contract and that is complete at the time the contract is entered; (2) does not address the relationship between insurer and the insured, but the relationship among those left at the demise of the insurer; and (3) is not confined to policyholders, but governs the rights of all creditors. *Id.*, at 353–354 (opinion of Jones, J.).

We granted certiorari, 504 U. S. 907 (1992), to resolve the conflict among the Courts of Appeals on the question whether a state statute governing the priority of claims

---

[4] One judge concurred separately on the ground that the McCarran-Ferguson Act was not intended to modify the longstanding, traditional state regulation of insurance company liquidations. See 939 F. 2d, at 352 (opinion of Edgar, J.).

against an insolvent insurer is a "law enacted . . . for the purpose of regulating the business of insurance," within the meaning of § 2(b) of the McCarran-Ferguson Act.[5]

## II

The McCarran-Ferguson Act was enacted in response to this Court's decision in *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944). Prior to that decision, it had been assumed that "[i]ssuing a policy of insurance is not a transaction of commerce," *Paul* v. *Virginia*, 8 Wall. 168, 183 (1869), subject to federal regulation. Accordingly, "the States enjoyed a virtually exclusive domain over the insurance industry." *St. Paul Fire & Marine Ins. Co.* v. *Barry*, 438 U. S. 531, 539 (1978).

The emergence of an interconnected and interdependent national economy, however, prompted a more expansive jurisprudential image of interstate commerce. In the intervening years, for example, the Court held that interstate commerce encompasses the movement of lottery tickets from State to State, *Lottery Case*, 188 U. S. 321 (1903), the transport of five quarts of whiskey across state lines in a private automobile, *United States* v. *Simpson*, 252 U. S. 465 (1920), and the transmission of an electrical impulse over a wire between Alabama and Florida, *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1 (1878). It was not long before the Court was forced to come to terms with these decisions in the insurance context. Thus, in *South-Eastern Underwriters*, it held that an insurance company that conducted a substantial part of its business across state lines was engaged in interstate commerce and thereby was subject to the antitrust laws. This result, naturally, was widely perceived as a threat to state power to tax and regulate the

---

[5] Compare the result reached by the Sixth Circuit in this litigation with *Gordon* v. *United States Dept. of Treasury*, 846 F. 2d 272 (CA4), cert. denied, 488 U. S. 954 (1988), and *Idaho ex rel. Soward* v. *United States*, 858 F. 2d 445 (CA9 1988), cert. denied, 490 U. S. 1065 (1989).

insurance industry. To allay those fears, Congress moved quickly to restore the supremacy of the States in the realm of insurance regulation. It enacted the McCarran-Ferguson Act within a year of the decision in *South-Eastern Underwriters*.

The first section of the McCarran-Ferguson Act makes its mission very clear: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U. S. C. § 1011. Shortly after passage of the Act, the Court observed: "Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408, 429 (1946). Congress achieved this purpose in two ways. The first "was by removing obstructions which might be thought to flow from [Congress'] own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation." *Id.*, at 429–430. The second "was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it 'shall be subject to' the laws of the several states in these respects." *Id.*, at 430.

### III

"[T]he starting point in a case involving construction of the McCarran-Ferguson Act, like the starting point in any case involving the meaning of a statute, is the language of the statute itself." *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S. 205, 210 (1979). Section 2(b) of the McCarran-Ferguson Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business

of insurance . . . unless such Act specifically relates to the business of insurance." 15 U. S. C. § 1012(b). The parties agree that application of the federal priority statute would "invalidate, impair, or supersede" the Ohio priority scheme and that the federal priority statute does not "specifically relat[e] to the business of insurance." All that is left for us to determine, therefore, is whether the Ohio priority statute is a law enacted "for the purpose of regulating the business of insurance."

This Court has had occasion to construe this phrase only once. On that occasion, it observed: "Statutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly, are laws regulating the 'business of insurance,'" within the meaning of the phrase. *SEC* v. *National Securities, Inc.*, 393 U. S. 453, 460 (1969). The opinion emphasized that the focus of McCarran-Ferguson is upon the relationship between the insurance company and its policyholders:

> "The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder." *Ibid.*

In that case, two Arizona insurance companies merged and received approval from the Arizona Director of Insurance, as required by state law. The Securities and Exchange Commission sued to rescind the merger, alleging that the merger-solicitation papers contained material misstatements, in violation of federal law. This Court held that, insofar as the Arizona law was an attempt to protect the inter-

ests of an insurance company's shareholders, it did not fall within the scope of the McCarran-Ferguson Act. *Ibid.* The Arizona statute, however, also required the Director, before granting approval, to make sure that the proposed merger "would not 'substantially reduce the security of and service to be rendered to policyholders.'" *Id.,* at 462. The Court observed that this section of the statute "clearly relates to the 'business of insurance.'" *Ibid.* But because the "paramount federal interest in protecting shareholders [was] perfectly compatible with the paramount state interest in protecting policyholders," *id.,* at 463, the Arizona statute did not preclude application of the federal securities laws.

In the present case, on the other hand, there is a direct conflict between the federal priority statute and Ohio law. Under the terms of the McCarran-Ferguson Act, 15 U. S. C. § 1012(b), therefore, federal law must yield to the extent the Ohio statute furthers the interests of policyholders.

Minimizing the analysis of *National Securities,* petitioners invoke *Royal Drug* and *Pireno* in support of their argument that the liquidation of an insolvent insurance company is not part of the "business of insurance" exempt from pre-emption under the McCarran-Ferguson Act. Those cases identified the three criteria, noted above, that are relevant in determining what activities constitute the "business of insurance." See *Pireno,* 458 U. S., at 129. Petitioners argue that the Ohio priority statute satisfies none of these criteria. According to petitioners, the Ohio statute merely determines the order in which creditors' claims will be paid, and has nothing to do with the transfer of risk from insured to insurer. Petitioners also contend that the Ohio statute is not an integral part of the policy relationship between insurer and insured and is not limited to entities within the insurance industry because it addresses only the relationship between policyholders and other creditors of the defunct corporation.

To be sure, the Ohio statute does not directly regulate the "business of insurance" by prescribing the terms of the

insurance contract or by setting the rate charged by the insurance company. But we do not read *Pireno* to suggest that the business of insurance is confined entirely to the writing of insurance contracts, as opposed to their performance. *Pireno* and *Royal Drug* held only that "ancillary activities" that do not affect performance of the insurance contract or enforcement of contractual obligations do not enjoy the antitrust exemption for laws regulating the "business of insurance." *Pireno*, 458 U. S., at 134, n. 8. In *Pireno*, we held that use of a peer review committee to advise the insurer as to whether charges for chiropractic services were reasonable and necessary was not part of the business of insurance. The peer review practice at issue in that case had nothing to do with whether the insurance contract was performed; it dealt only with calculating what fell within the scope of the contract's coverage. *Id.*, at 130. We found the peer review process to be "a matter of indifference to the policyholder, whose only concern is *whether* his claim is paid, not *why* it is paid" (emphases in original). *Id.*, at 132. Similarly, in *Royal Drug*, we held that an insurer's agreements with participating pharmacies to provide benefits to policyholders was not part of the business of insurance. "The benefit promised to Blue Shield policyholders is that their premiums will cover the cost of prescription drugs except for a $2 charge for each prescription. So long as that promise is kept, policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies." 440 U. S., at 213–214 (footnote omitted).

There can be no doubt that the actual performance of an insurance contract falls within the "business of insurance," as we understood that phrase in *Pireno* and *Royal Drug*. To hold otherwise would be mere formalism. The Court's statement in *Pireno* that the "transfer of risk from insured to insurer is effected by means of the contract between the parties . . . and . . . is complete at the time that the contract is entered," 458 U. S., at 130, presumes that the insurance

contract in fact will be enforced. Without performance of the terms of the insurance policy, there is no risk transfer at all. Moreover, performance of an insurance contract also satisfies the remaining prongs of the *Pireno* test: It is central to the policy relationship between insurer and insured and is confined entirely to entities within the insurance industry. The Ohio priority statute is designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy. Because it is integrally related to the performance of insurance contracts after bankruptcy, Ohio's law is one "enacted by any State for the purpose of regulating the business of insurance." 15 U. S. C. § 1012(b).

Both *Royal Drug* and *Pireno*, moreover, involved the scope of the antitrust immunity located in the *second* clause of § 2(b). We deal here with the *first* clause, which is not so narrowly circumscribed. The language of § 2(b) is unambiguous: The first clause commits laws "enacted . . . for the purpose of regulating the business of insurance" to the States, while the second clause exempts only "the business of insurance" itself from the antitrust laws. To equate laws "enacted . . . for the purpose of regulating the business of insurance" with the "business of insurance" itself, as petitioners urge us to do, would be to read words out of the statute. This we refuse to do.[6]

---

[6] The dissent contends that our reading of the McCarran-Ferguson Act "runs counter to the basic rule of statutory construction that identical words used in different parts of the same Act are intended to have the same meaning." *Post*, at 515. This argument might be plausible if the two clauses actually employed identical language. But they do not. As explained above, the first clause contains the word "purpose," a term that is significantly missing from the second clause. By ignoring this word, the dissent overlooks another maxim of statutory construction: "that a court should '"give effect, if possible, to every clause and word of a statute."'" *Moskal* v. *United States*, 498 U. S. 103, 109–110 (1990), quoting *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955), and *Montclair* v. *Ramsdell*, 107 U. S. 147, 152 (1883).

The broad category of laws enacted "for the purpose of regulating the business of insurance" consists of laws that possess the "end, intention, or aim" of adjusting, managing, or controlling the business of insurance. Black's Law Dictionary 1236, 1286 (6th ed. 1990). This category necessarily encompasses more than just the "business of insurance." For the reasons expressed above, we believe that the actual performance of an insurance contract is an essential part of the "business of insurance." Because the Ohio statute is "aimed at protecting or regulating" the performance of an insurance contract, *National Securities*, 393 U. S., at 460, it follows that it is a law "enacted for the purpose of regulating the business of insurance," within the meaning of the first clause of § 2(b).

Our plain reading of the McCarran-Ferguson Act also comports with the statute's purpose. As was stated in *Royal Drug*, the first clause of § 2(b) was intended to further Congress' primary objective of granting the States broad regulatory authority over the business of insurance. The second clause accomplishes Congress' secondary goal, which was to carve out only a narrow exemption for "the business of insurance" from the federal antitrust laws. 440 U. S., at 218, n. 18. Cf. D. Howard, Uncle Sam versus the Insurance Commissioners: A Multi-Level Approach to Defining the "Business of Insurance" Under the McCarran-Ferguson Act, 25 Willamette L. Rev. 1 (1989) (advocating an interpretation of the two clauses that would reflect their dual purposes); Note, The Definition of "Business of Insurance" Under the McCarran-Ferguson Act After *Royal Drug*, 80 Colum. L. Rev. 1475 (1980) (same).

Petitioners, however, also contend that the Ohio statute is not an insurance law but a bankruptcy law because it comes into play only when the insurance company has become insolvent and is in liquidation, at which point the insurance company no longer exists. We disagree. The primary purpose of a statute that distributes the insolvent insurer's assets to

policyholders in preference to other creditors is identical to the primary purpose of the insurance company itself: the payment of claims made against policies. And "mere matters of form need not detain us." *National Securities*, 393 U. S., at 460. The Ohio statute is enacted "for the purpose of regulating the business of insurance" to the extent that it serves to ensure that, if possible, policyholders ultimately will receive payment on their claims. That the policyholder has become a creditor and the insurer a debtor is not relevant.

## IV

Finding little support in the plain language of the statute, petitioners resort to its legislative history. Petitioners rely principally upon a single statement in a House Report:

> "It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *Southeastern Underwriters Association* case." H. R. Rep. No. 143, 79th Cong., 1st Sess., 3 (1945).

From this statement, petitioners argue that the McCarran-Ferguson Act was an attempt to "turn back the clock" to the time prior to *South-Eastern Underwriters*. At that time, petitioners maintain, the federal priority statute would have superseded any inconsistent state law.

Even if we accept petitioners' premise, the state of the law prior to *South-Eastern Underwriters* is far from clear. Petitioners base their argument upon *United States* v. *Knott*, 298 U. S. 544 (1936), which involved the use and disposition of funds placed with the Florida treasurer as a condition of an insurer's conducting business in the State. According to petitioners, *Knott* stands for the proposition that the federal priority statute pre-empted inconsistent state laws even before *South-Eastern Underwriters*. But this proffered analogy to *Knott* unravels upon closer inspection. In that case,

the Court applied the federal priority statute only when the State had not specifically legislated the priority of claims. 298 U. S., at 549–550 ("But it is settled that an inchoate lien is not enough to defeat the [Federal Government's] priority . . . . Unless the law of Florida effected . . . either a transfer of title from the company, or a specific perfected lien in favor of the Florida creditors, the United States is entitled to priority"). Moreover, other cases issued at the same time reached a different result. See, *e. g.*, *Conway* v. *Imperial Life Ins. Co.*, 207 La. 285, 21 So. 2d 151 (1945) (Louisiana statute specifically providing that deposited securities are held by state treasurer in trust for benefit and protection of policyholders supersedes federal priority statute).

More importantly, petitioners' interpretation of the statute is at odds with its plain language. The McCarran-Ferguson Act did not simply overrule *South-Eastern Underwriters* and restore the status quo. To the contrary, it transformed the legal landscape by overturning the normal rules of preemption. Ordinarily, a federal law supersedes any inconsistent state law. The first clause of § 2(b) reverses this by imposing what is, in effect, a clear-statement rule, a rule that state laws enacted "for the purpose of regulating the business of insurance" do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise. That Congress understood the effect of its language becomes apparent when we examine other parts of the legislative history.[7] The second clause of § 2(b) also broke new ground: It

---

[7] Elaborating upon the purpose animating the first clause of § 2(b) of the McCarran-Ferguson Act, Senator Ferguson observed:

"What we have in mind is that the insurance business, being interstate commerce, if we merely enact a law relating to interstate commerce, or if there is a law now on the statute books relating in some way to interstate commerce, it would not apply to insurance. We wanted to be sure that the Congress, in its wisdom, would act specifically with reference to insurance in enacting the law." 91 Cong. Rec. 1487 (1945).

This passage later confirms that "no existing law and no future law should, by mere implication, be applied to the business of insurance" (statement of Mr. Mahoney). *Ibid.*

"embod[ied] a legislative rejection of the concept that the insurance industry is outside the scope of the antitrust laws—a concept that had prevailed before the *South-Eastern Underwriters* decision." *Royal Drug*, 440 U. S., at 220.

Petitioners' argument appears to find its origin in the Court's statement in *National Securities* that "[t]he McCarran-Ferguson Act was an attempt to turn back the clock, to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation." 393 U. S., at 459. The Court was referring to the primary purpose underlying the Act, namely, to restore to the States broad authority to tax and regulate the insurance industry. Petitioners would extrapolate from this general statement an invitation to engage in a detailed point-by-point comparison between the regime created by McCarran-Ferguson and the one that existed before. But it is impossible to compare our present world to the one that existed at a time when the business of insurance was believed to be beyond the reach of Congress' power under the Commerce Clause.

## V

We hold that the Ohio priority statute, to the extent that it regulates policyholders, is a law enacted for the purpose of regulating the business of insurance. To the extent that it is designed to further the interests of other creditors, however, it is not a law enacted for the purpose of regulating the business of insurance. Of course, every preference accorded to the creditors of an insolvent insurer ultimately may redound to the benefit of policyholders by enhancing the reliability of the insurance company. This argument, however, goes too far: "But in that sense, every business decision made by an insurance company has some impact on its reliability . . . and its status as a reliable insurer." *Royal Drug*, 440 U. S., at 216–217. *Royal Drug* rejected the notion that such

indirect effects are sufficient for a state law to avoid pre-emption under the McCarran-Ferguson Act. *Id.*, at 217.[8]

We also hold that the preference accorded by Ohio to the expenses of administering the insolvency proceeding is reasonably necessary to further the goal of protecting policy-holders. Without payment of administrative costs, liquidation could not even commence. The preferences conferred upon employees and other general creditors, however, do not escape pre-emption because their connection to the ultimate aim of insurance is too tenuous. Cf. *Langdeau* v. *United States*, 363 S. W. 2d 327 (Tex. Civ. App. 1962) (state statute according preference to employee wage claims is not a law enacted for the purpose of regulating the business of insurance). By this decision, we rule only upon the clash of priorities as pronounced by the respective provisions of the federal statute and the Ohio Code. The effect of this decision upon the Ohio Code's remaining priority provisions—includ-

---

[8] The dissent assails our holding at both ends, contending that it at once goes too far and not quite far enough. On the one hand, the dissent suggests that our holding is too "broad" in the sense that "any law which redounds to the benefit of policyholders is, *ipso facto*, a law enacted to regulate the business of insurance." *Post*, at 511. But this is precisely the argument we reject in the text, as evidenced by the narrowness of our actual holding. Uncomfortable with our distinction between the priority given to policyholders and the priority afforded other creditors, the dissent complains, on the other hand, that this is evidence of a "serious flaw." *Post*, at 517. But the dissent itself concedes that a state statute regulating the liquidation of insolvent insurance companies need not be treated as a package which stands or falls in its entirety. *Post*, at 518. Given this concession, it is the dissent's insistence upon an all-or-nothing approach to this particular statute that is flawed. The dissent adduces no support for its assertion that we must deal with the various priority provisions of the Ohio law as if they were all designed to further a single end. That was not the approach taken by this Court in *National Securities*, which carefully parsed a state statute with dual goals and held that it regulated the business of insurance only to the extent that it protected policyholders. *Supra*, at 502. And the dissent misinterprets our pronouncement on the clash of priorities as a "compromise holding," *post*, at 517, forgetting that the severability of the various priority provisions is a question of state law.

ing any issue of severability—is a question of state law to be addressed upon remand. Cf. *Stanton* v. *Stanton*, 421 U. S. 7, 17–18 (1975) (invalidating state statute specifying greater age of majority for males than for females and remanding to state court to determine age of majority applicable to both groups under state law).

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE SCALIA, JUSTICE SOUTER, and JUSTICE THOMAS join, dissenting.

With respect and full recognition that the statutory question the majority considers with care is difficult, I dissent from the opinion and judgment of the Court.

We consider two conflicting statutes, both attempting to establish priority for claims of the United States in proceedings to liquidate an insolvent insurance company. The first is the federal priority statute, 31 U. S. C. § 3713, which requires a debtor's obligations to the United States to be given first priority in insolvency proceedings. The second, Ohio's insurance company liquidation statute, Ohio Rev. Code Ann. § 3903.42 (1989), provides that claims of the Federal Government are to be given fifth priority in proceedings to liquidate an insolvent insurer. Under usual principles of pre-emption, the federal priority statute trumps the inconsistent state law. See *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963). The question is whether the McCarran-Ferguson Act, which provides an exemption from pre-emption for certain state laws "enacted . . . for the purpose of regulating the business of insurance," 59 Stat. 34, as amended, 15 U. S. C. § 1012(b), alters this result.

Relying primarily on our decision in *SEC* v. *National Securities, Inc.*, 393 U. S. 453 (1969), the majority concludes

that portions of Ohio's priority statute are saved from preemption by the McCarran-Ferguson Act. I agree that *National Securities* is the right place to begin the analysis. As the Court points out, *National Securities* is the one case in which we have considered the precise statutory provision that is controlling here to determine whether a state law applicable to insurance companies was a law enacted for the purpose of regulating the business of insurance. I disagree, however, with the Court's interpretation of that precedent.

The key to our analysis in *National Securities* was the construction of the term "business of insurance." In *National Securities* we said that statutes designed to protect or regulate the relationship between an insurance company and its policyholder, whether this end is accomplished in a direct or an indirect way, are laws regulating the business of insurance. 393 U. S., at 460. While noting that the exact scope of the McCarran-Ferguson Act was unclear, we observed that in passing the Act "Congress was concerned with the type of state regulation that centers around the contract of insurance." *Ibid.* There is general agreement that the primary concerns of an insurance contract are the spreading and the underwriting of risk, see 1 G. Couch, Cyclopedia of Insurance Law § 1.3 (2d ed. 1984); R. Keeton, Insurance Law § 1.2(a) (1971), and we have often recognized this central principle. See *Union Labor Life Ins. Co.* v. *Pireno*, 458 U. S. 119, 127, and n. 7 (1982); *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S. 205, 211–212 (1979).

When the majority applies the holding of *National Securities* to the case at bar, it concludes that the Ohio statute is not pre-empted to the extent it regulates the "performance of an insurance contract," *ante*, at 505, by ensuring that "policyholders ultimately will receive payment on their claims," *ante*, at 506. Under the majority's reasoning, see *ante*, at 493, 508, any law which redounds to the benefit of policyholders is, *ipso facto*, a law enacted to regulate the business of insurance. States attempting to discern the scope of powers

reserved for them under the McCarran-Ferguson Act will find it difficult, as do I, to reconcile our precedents in this area with the decision the Court reaches today. The majority's broad holding is not a logical extension of our decision in *National Securities* and indeed is at odds with it.

The function of the Ohio statute before us is to regulate the priority of competing creditor claims in proceedings to liquidate an insolvent insurance company. On its face, the statute's exclusive concentration is not policyholder protection, but creditor priority. The Ohio statute states that its comprehensive purpose is "the protection of the interests of insureds, claimants, creditors, and the public generally, with minimum interference with the normal prerogatives of the owners and managers of insurers." Ohio Rev. Code Ann. §3903.02(D) (1989). It can be said that Ohio's insolvency scheme furthers the interests of policyholders to the extent the statute gives policyholder claims priority over the claims of the defunct insurer's other creditors. But until today that result alone would not have qualified Ohio's liquidation statute as a law enacted for the purpose of regulating the business of insurance. The Ohio law does not regulate or implicate the "true underwriting of risks, the one earmark of insurance." *SEC* v. *Variable Annuity Life Ins. Co. of America,* 359 U. S. 65, 73 (1959) (footnote omitted). To be sure, the Ohio priority statute increases the probability that an insured's claim will be paid in the event of insurer insolvency. But such laws, while they may "furthe[r] the interests of policyholders," *ante,* at 502, have little to do with the relationship between an insurer and its insured, *National Securities,* 393 U. S., at 460, and as such are not laws regulating the business of insurance under the McCarran-Ferguson Act. The State's priority statute does not speak to the transfer of risk embodied in the contract of insurance between the parties. Granting policyholders priority of payment over other creditors does not involve the transfer of

risk from insured to insurer, the type of risk spreading that is the essence of the contract of insurance.

Further, insurer insolvency is not an activity of insurance companies that "relate[s] so closely to their status as reliable insurers," *ibid.*, as to qualify liquidation as an activity constituting the "core of the 'business of insurance.'" *Ibid.* Respondent maintains, and the majority apparently agrees, that nothing is more central to the reliability of an insurer than facilitating the payment of policyholder claims in the event of insurer insolvency. This assertion has a certain intuitive appeal, because certainly the payment of claims is of primary concern to policyholders, and policyholders have a vital interest in the financial strength and solvency of their insurers. But state insolvency laws requiring policyholder claims to be paid ahead of the claims of the rest of the insurer's creditors do not increase the reliability or the solvency of the insurer; they operate, by definition, too late in the day for that. Instead they operate as a state-imposed safety net for the benefit of those insured. In my view, the majority too easily dismisses the fact that the policyholder has become a creditor and the insurer a debtor by reason of the insurance company's demise. *Ante*, at 506. Whereas we said in *National Securities* that the focus of the McCarran-Ferguson Act is the relationship between insurer and insured, 393 U. S., at 460, the Ohio statute before us regulates a different relationship: the relationship between the policyholder and the other competing creditors. This is not the regulation of the business of insurance, but the regulation of creditors' rights in an insolvency proceeding.

I do not share the view of the majority that it is fair to characterize the effect of Ohio's liquidation scheme as "empower[ing] the liquidator to continue to operate the [insolvent] insurance company in all ways but one—the issuance of new policies." *Ante*, at 494. The change accomplished by the Ohio statute is not just a cosmetic change in management. Once the Ohio Court of Common Pleas directs the

Superintendent of Insurance to liquidate an insolvent insurance company, the process of winding up the activities of the insolvent insurance company begins. No new policies issue, and existing policies are recalled and settled. See § 3903.19. The Ohio priority statute does not regulate the ongoing business of insurance; it facilitates disbursement of a defunct insurance business' assets in a way the Ohio Legislature deems equitable. As we were careful to note in *National Securities*, the McCarran-Ferguson Act "did not purport to make the States supreme in regulating all the activities of insurance companies." 393 U. S., at 459 (emphasis omitted). The McCarran-Ferguson Act does not displace the standard preemption analysis for the state regulation of insurance companies; it does so for the state regulation of the business of insurance. *Ibid.* That the Ohio statute is within the class of state laws applicable to insurance companies does not mean the law regulates an integral aspect of the contractual insurance transaction.

In my view, one need look no further than our opinion in *National Securities* to conclude that the Ohio insolvency statute is not a law "enacted . . . for the purpose of regulating the business of insurance." Even so, our decisions in *Pireno* and *Royal Drug* further undercut the Court's holding, despite the majority's attempt to distinguish them. My disagreement with the Court on this point turns on a close interpretation of 15 U. S. C. § 1012(b), which states as follows:

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance: *Provided,* That . . . [the federal antitrust statutes] shall be applicable to the business of insurance to the extent that such business is not regulated by State Law."

The phrase "business of insurance" is used three times and in two different clauses of the Act. The first clause of § 1012(b) is directed to the States, and provides that state laws enacted for the purpose of regulating the business of insurance are saved from pre-emption if there is no conflicting federal law which relates specifically to the business of insurance. The second clause of § 1012(b) is directed at insurers, and allows insurers an exemption from the federal antitrust laws for activities regulated by state law which qualify as the business of insurance. Respondent has argued that cases such as *Royal Drug* and *Pireno,* which addressed whether certain activities of insurers constituted the "business of insurance" under the second clause of § 1012(b), do not control cases in which the first clause of § 1012(b) is at issue. On the way to accepting respondent's suggestion, the majority observes, *ante,* at 504, that the phrase "business of insurance" in the first clause of § 1012(b) is "not so narrowly circumscribed" as the identical phrase in the second clause.

It is true that laws enacted for the purpose of regulating the business of insurance are something different from activities of insurers constituting the business of insurance, *ibid.,* but in my mind this distinction does not compel a conclusion that cases such as *Royal Drug* and *Pireno* have no application here. As an initial matter, it would be unusual to conclude that the meaning of the phrase "business of insurance" is transformed from one clause to the next. Such a conclusion runs counter to the basic rule of statutory construction that identical words used in different parts of the same Act are intended to have the same meaning. *Sullivan* v. *Stroop,* 496 U. S. 478, 484 (1990); *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 433 (1932). While maxims of statutory construction admit of exceptions, there are other obstacles to adopting the view that cases such as *Royal Drug* and *Pireno* apply only in the antitrust realm. First, nothing in *Royal Drug* or *Pireno* discloses a purpose

to limit their reach in this way. Indeed while we have had numerous opportunities to examine and to apply the McCarran-Ferguson Act in different contexts, we have never hinted that the meaning of the phrase "business of insurance" changed whether we addressed laws "enacted for the purpose of regulating the business of insurance" or activities of insurers constituting the "business of insurance." Further, the suggestion that *Pireno*'s three-tier test has application only in antitrust cases is discredited by our decisions citing the *Pireno* test in contexts unrelated to antitrust. For instance, we have employed the *Pireno* test to determine whether certain state laws fall within the pre-emption saving clause of the Employee Retirement Income Security Act of 1974. See *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 48–49 (1987); *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 742–743 (1985).

*Royal Drug* and *Pireno* are best viewed as refinements of this Court's analysis in *National Securities,* tailored to address activities of insurance companies that would implicate the federal antitrust laws were it not for the McCarran-Ferguson Act. Although these cases were decided in accordance with the rule that exemptions from the antitrust laws are to be construed narrowly, see *Pireno,* 458 U. S., at 126; *Royal Drug,* 440 U. S., at 231, I see no reason why general principles derived from them are not applicable to any case involving the scope of the term "business of insurance" under the McCarran-Ferguson Act.

An examination of *Pireno* and *Royal Drug* reveals that those decisions merely expand upon the statements we made about the business of insurance in *National Securities.* In *National Securities,* we determined that the essence of the business of insurance involves those activities central to the relationship between the insurer and the insured. 393 U. S., at 460. *Pireno* reiterates that principle and identifies three factors which shed light on the task of determining whether a particular activity has the requisite connection to the

policyholder and insurance company relationship as to constitute the business of insurance. *Pireno* considers: "*[F]irst*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." 458 U. S., at 129.

The Ohio statute here does not qualify as regulating the business of insurance under *Pireno*'s tripartite test for the same reason that it fails to do so under *National Securities:* It regulates an activity which is too removed from the contractual relationship between the policyholder and the insurance company. First, the risk of insurer insolvency addressed by the statute is distinct from the risk the policyholder seeks to transfer in an insurance contract. The transfer of risk from insured to insurer is effected "by means of the contract between the parties—the insurance policy— and that transfer is complete at the time that the contract is entered." *Id.*, at 130. As to the second prong, the Ohio statute does not regulate the relationship between the insured and the insurer, but instead addresses the relationship among all creditors the insurer has left in the lurch. Finally, it is plain that the statute is not limited to entities within the insurance industry. The statute governs the rights of all creditors of insolvent insurance companies, including employees, general creditors, and stockholders, as well as government entities.

Quite apart from my disagreement with the majority over which of our precedents have relevance to the issue before us, I think the most serious flaw of its analytic approach is disclosed in the compromise holding it reaches. The Court comes to the conclusion that the Ohio insolvency statute is a regulation of the business of insurance only to the extent that policyholder claims (as well as administrative expenses necessary to facilitate the payment of those claims) are given priority ahead of the claims of the Federal Government. At

one level the majority opinion may seem rather satisfying, for it gives something to Ohio's regulatory scheme (policyholder claims displace the federal priority) and something to the federal scheme (the Federal Government's priority displaces all other claimants). The equitable result is attractive enough given the conflicting interests here. But I should have thought that a law enacted to determine the priority of creditor claims in proceedings to liquidate an insolvent insurance company either is the regulation of the business of insurance or is not. Of course a single state statutory scheme may regulate many aspects of insurance businesses, some of which may, and some of which may not, constitute the "business of insurance" under our precedents. For instance in *National Securities* we held that an Arizona law authorizing a state official to approve mergers of insurance companies was a law regulating the business of insurance to the extent the official acted to ensure that the merger did not "substantially reduce the security of and service to be rendered to policyholders," 393 U. S., at 462, but not when the official acted to ensure that the merger was not "[i]nequitable to the stockholders of any insurer," *id.*, at 457. But the subject of the regulation in the case before us is quite different from the portion of the Arizona statute held to be the business of insurance in *National Securities*. The Arizona law regulated the business of insurance because by allowing a state official to ensure that the merger of two insurance companies did not reduce the "security of and service to be rendered policyholders," *id.*, at 462, the state law functioned to preserve the reliability of an ongoing insurance business. In contrast, as explained, *supra*, at 513, the Ohio liquidation statute before us does not increase the reliability or solvency of the insurer. Instead it operates to allocate the assets of a defunct insurer. This is so whether the claims of policyholders are ranked first under the state law or dead last. The inquiry under McCarran-Ferguson is whether a law regulating the priority of creditor claims reg-

ulates the business of insurance. If so, the order in which Ohio chooses to rank creditor (and policyholder) priority is beyond the concern of the Act.

Even though Ohio's insurance liquidation statute is not a law enacted for the purpose of regulating the business of insurance, I underscore that no provision of federal law precludes Ohio from establishing procedures to address the liquidation of insolvent insurance companies. The State's prerogative to do so, however, does not emanate from its recognized power to enact laws regulating the business of insurance under the McCarran-Ferguson Act, but from the longstanding decision of Congress to exempt insurance companies from the federal bankruptcy code. 11 U. S. C. §§ 109 (b)(2), (d). The States are not free to enact legislation inconsistent with the federal priority statute, and in my view the majority errs in applying the McCarran-Ferguson Act to displace the traditional principles of pre-emption that should apply. I would reverse the judgment of the Court of Appeals.