# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 15, 2016          Decided July 1, 2016

No. 15-5309

STATE OF WEST VIRGINIA, EX REL. PATRICK MORRISEY,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01287)

*Elbert Lin*, Solicitor General, Office of the Attorney General for the State of West Virginia, argued the cause for appellant. With him on the briefs were *Patrick J. Morrisey*, Attorney General, and *Julie Marie Blake*, Assistant Attorney General.

*Lindsey Powell*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *Alisa B. Klein* and *Mark B. Stern*, Attorneys.

Before: KAVANAUGH and WILKINS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*:   This is rather an unusual case.   West Virginia has sued to challenge the President's determination *not* to enforce certain controversial provisions of the Affordable Care Act for a transitional period. That decision, implemented by a letter from the Secretary of the Department of Health and Human Services, left the responsibility to enforce or not to enforce these provisions to the States, and West Virginia objects to being put in that position. We conclude that West Virginia, not having suffered an injury-in-fact, lacks standing.

I.

The Act, as is well known, mandated minimum coverage requirements for all health insurance plans offered in the individual market.[1] And it has been common in national health care law to employ a dual federal-state enforcement mechanism.[2] Typically the States have the initial responsibility to enforce the law, but if the States decline or fail to enforce, the federal government is a backup enforcer.   That approach was followed in the Affordable Care Act provisions. *See* 42 U.S.C. § 300gg-22(a)(1).

---

[1]Among other rules, policies are limited in what can be factored into price variation, must be extended regardless of certain traditional barriers such as medical history and health status, and may not discriminate on several bases traditionally used to tailor plans to individual consumers. *See generally* 42 U.S.C. § 300gg–300gg-6, 300gg-8.

[2]*See generally U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 500 (1993). The Act primarily amended the Public Health Service Act.

Insurance companies responded quickly to the new requirement. Millions of cancellation notices were sent out in the fall of 2013, warning policyholders their plans would be illegal once the new regulation took effect. All hell broke loose as policies were cancelled, leading to Congressional promises to modify the law to prevent cancellations.

The President acted, allegedly, to pre-empt Congress. He announced the federal government would hold off on enforcing the statutory requirements. Accordingly, HHS sent a letter to the States announcing a "transitional policy," allowing health insurers with certain conditions[3] to continue policies that would be outlawed under the statute for a period of a year (later extended for another three years).

That left the States holding the bag. They had to decide whether to enforce or not to enforce the very conditions that the federal government determined to abandon for the transitional period. West Virginia initially decided to enforce, but after HHS extended the transitional period, West Virginia opted to decline to enforce the mandates.

The State brought suit for declaratory and injunctive relief. It argued that the new policy violates the plain language of the Act, which mandates that the Secretary "shall" enforce the requirements, when States do not. While there may be room for case-by-case enforcement discretion, the State claimed, HHS was not at liberty to decline wholesale enforcement of the

---

[3]Insurers were required to make disclosures to policyholders about the noncompliance of their plans, as well as make information available for enrollment in another, compliant plan, should the holder so choose.

provisions.[4]  Moreover, the State claimed the new policy violated the APA because it amounted to a substantive and binding rule that was issued without the required notice-and-comment.

West Virginia also brought two constitutional claims.  It contended that the federal non-enforcement policy unlawfully delegated away federal executive authority.  And it argued that the policy violated the Tenth Amendment by foisting upon States the final and determinative decision as to whether the Act's market requirements would be enforced within the State itself.  This, the State alleged, blurred the lines of political accountability identified as crucial in previous cases such as *Printz v. United States*, 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992).

Perhaps the most peculiar aspect of the case is the preferred remedy sought.  West Virginia seeks a declaratory judgment that the Administration's actions are illegal, but not "vacatur" of the Secretary's letter, apparently to induce the Administration to negotiate a statutory fix from Congress.  Only if that failed would equitable relief be sought.

The district court concluded West Virginia lacked standing because it had not suffered an injury-in-fact, and this appeal followed.

---

[4]A similar argument was levied against Administration immigration policy. *See Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *cert. granted*, 136 S. Ct. 906 (U.S. Jan. 19, 2016) (No. 15-674). Unlike the States in the Texas case, however, the State of West Virginia has not argued (presumably because it cannot argue) that the federal government's decision not to enforce the statute has itself imposed monetary costs on West Virginia.

5

II.

Although Appellant challenges the federal government's decision to decline enforcement, West Virginia conceded at oral argument that its claim of injury-in-fact is identical to that which would exist if Congress had initially provided that only States had authority to enforce the federal mandate.  It is claimed that if Congress were to do that, it would be illegally enlisting States to bear the responsibility, politically, to decide whether to enforce, or implement, a federal statute.  In this case, instead, it is the federal government's enforcement decision that allegedly created the same injury.  But we simply do not understand why, in either case, the grant of that discretion to the States creates an injury-in-fact.

Appellant relies on the Supreme Court case holdings, in *Printz* and *New York*, that federal statutes that compel States to implement those statutes violate the Constitution.  The closer case, *Printz*, did hold that a statute requiring state legal officers to conduct background checks on gun purchases was unconstitutional (based primarily on implications from the structure of the Constitution).  But in their opinion, the majority explained the key to its conclusion was that the State was *compelled* to carry out a federal command. *See Printz*, 521 U.S. at 924-35.  The same was true in *New York*, which involved a federal law that required States to either pass legislation dealing with radioactive waste disposal, or to take title to and possession of it. *See New York*, 505 U.S. at 151-54.  Since in both cases the States were compelled to act, no issue of standing was even raised or discussed.

Appellant would extend those cases to the proposition that when the federal government abandons enforcement of a federal statute, leaving States with the responsibility (or, for that matter, Congress delegates discretion to implement a federal statute

directly to a state), that also is unconstitutional. Requiring the States to assume the political responsibility of deciding whether or not to implement a federal statute supposedly creates an injury-in-fact.

There is simply no support for this extraordinary claim. Although Appellant dresses up its argument as a breach of State sovereignty in violation of the Tenth Amendment, its injury is nothing more than the political discomfort in having the responsibility to determine whether to enforce or not – and thereby annoying some West Virginia citizens whatever way it decides. And no court has ever recognized political discomfort as an injury-in-fact. We do not doubt that West Virginia now confronts different political terrain than it did before HHS announced its new non-enforcement policy. But we do not think that represents cognizable legal injury. Increased political accountability of this nature – greater likelihood of political consequence in making a decision – is the kind of inherently immeasurable harm that our standing doctrines have been designed to screen out. Time, and time again, it has been stressed that an injury must be "concrete." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Rather cleverly, West Virginia insists – which is generally true – that we must assume the merits of its claim when determining whether standing exists. *See City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). Therefore, we have to acknowledge, according to Appellant, that the claimed encroachment into the State's sovereignty was an injury-in-fact. Still, even assuming that the administration's action created a theoretical breach of State sovereignty, West Virginia nevertheless lacks a *concrete* injury-in-fact. The case is analogous to those in which the government's actions are asserted to be unconstitutional but the plaintiff raises only a

"generally available grievance;" its injury is not particular. *See Lujan*, 504 U.S. at 573-74.

West Virginia's secondary argument is that any party, whether or not a governmental entity, has standing to challenge a delegation from the government to carry out a governmental responsibility. For that proposition, Appellant relies on *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). Without belaboring the complexities of that case, it is sufficient to note that standing was never discussed so, as is well known, the case is not a precedent for standing. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63 n.4 (1989). In any event, Appellant's claim is an untenable stretch. For instance, if Congress gave the D.C. Circuit authority, so long as we chose to use it, to set electrical rates in the country as we pleased, we certainly would not have standing to challenge that delegation as unconstitutional. Nor would the Secretary of Energy, if given the same authority.[5]

\* \* \*

For the foregoing reasons, the district court is affirmed.

*So ordered.*

---

[5]The requested remedy – remand without vacatur, so as to goad the President into working with Congress for a legislative solution – further suggests that Appellant's claim is basically a policy-based dispute.